Lawrence P. DiMICELI, Appellant,

v.

**AFFORDABLE POOL
MAINTENANCE,
INC., Appellee.**

No. 04–02–00497–CV.

Court of Appeals of Texas,
San Antonio.

May 7, 2003.

Michael J. Murray and Sharon E. Callaway, Crofts & Callaway, Jeffrey E. Dahl, Harkins, Latimer and Dahl, P.C., San Antonio, for Appellant.

Jeff Small, Alex Katzman, Katzman & Katzman, and Jeff Frey, Frank Rivas & Associates, San Antonio, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief, Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by CATHERINE STONE, Justice.

Appellant, Lawrence DiMiceli, appeals a judgment in favor of Affordable Pool Maintenance, Inc. ("APM"). A jury found that DiMiceli breached the parties' agreement for the renovation and repair of DiMiceli's swimming pool and also found that APM had performed compensable work to the benefit of DiMiceli. DiMiceli asserts four issues on appeal, contending that: (1) the trial court erred in rendering judgment in favor of APM on its claim of *quantum meruit*; (2) the jury's refusal to find APM liable for breach of contract and breach of the implied warranty of good and workmanlike performance is against the great weight and preponderance of the evidence; (3) the evidence is legally and factually insufficient to support the jury's finding that DiMiceli breached the parties' agreement and that DiMiceli's breach was not excused; and (4) the jury's award for attorney's fees is based on factually insufficient evidence. We agree with DiMiceli that APM cannot recover on the theory of *quantum meruit* as a matter of law. We reverse that part of the judgment rendered in favor of APM on its claim for *quantum meruit*. We conclude, however, that there is sufficient evidence to support the jury's finding that DiMiceli breached the parties' agreement. Therefore, we affirm the judgment as modified. *See* Tex. R.App. P. 43.2(b).

### FACTUAL AND PROCEDURAL BACKGROUND

A two-story cabana located in DiMiceli's backyard was destroyed as a result of a fire. The heat from the fire also damaged DiMiceli's swimming pool. After receiving estimates for the renovation and repair of the pool from various contractors, DiMiceli entered into a written service contract with APM on May 24, 1999. The service contract provided that APM would "drain [the] pool, light acid wash, remove old plaster, repair cracks as needed, repair gunite if required, reseal all skimmer faces, remove the old tile, install new tile,

hand trowel white marble plaster, replace 2 skimmers, install diving board brackets and diving board, stand and jig, [and] install [a] new light fixture." For these services, DiMiceli agreed to pay APM the amount of $7,250. Under the contract, APM would begin work on June 9, 1999 and complete the project by July 1, 1999. DiMiceli would make one installment payment at signing, another payment when APM started work, and a final payment at the completion of the project. DiMiceli separately contracted with another company, Concrete Innovations, to install a new deck and sidewalk around the pool.

APM sued DiMiceli in January 2000 alleging claims for breach of contract and *quantum meruit.* In support of its claims, APM alleged that DiMiceli failed to make a final installment payment of $3,530.47. APM also made a claim for attorney's fees. By his sixth amended original answer, DiMiceli asserted various counterclaims, including claims for breach of contract and breach of the implied warranty of good and workmanlike manner. The case was tried before a jury.

Andre Montwill, president of APM, testified that problems arose shortly after APM started on the job. APM noticed that the pool's beam was broken in certain areas. APM could not install decorative tile in areas where the beam was broken. It appeared to Montwill that the broken beam was a result of the removal of the deck and flagstones which surrounded the pool with a jackhammer. Montwill testified that he informed DiMiceli of the problem and the cost of repairing the broken beam. DiMiceli decided to have Concrete Innovations repair the beam when they poured the new deck. Montwill informed DiMiceli that this would make APM's job more difficult because they could end up with an uneven tile line. DiMiceli was unconvinced, and APM was removed from the project to allow Concrete Innovations to work. Upon its return, APM noted that the beam had been repaired, but that the pool was missing coping. Coping is the lip that surrounds a pool to prevent water from running into the pool. The coping was subsequently added by Concrete Innovations. However, the end product appeared uneven in certain areas. These uneven areas affected APM's placement of the decorative tile such that in some areas the tile line was not level with the water line.

DiMiceli also testified. DiMiceli admitted that he had hired a third-party to remove the flagstones around the pool and even removed some of the flagstones himself. However, he denied that the beam was broken after the removal of these flagstones. DiMiceli also testified about specific complaints he had regarding APM's work. According to DiMiceli, the decorative tile work was not level with the water line. DiMiceli also testified that the skimmers in the pool were "intolerable," and the underwater light installed by APM did not work. Finally, DiMiceli testified that APM failed to install a diving board.

Lawrence Hans, engineer, testified as an expert witness on behalf of DiMiceli. Hans testified that it appeared that each of the sub-contractors conducted their work without supervision. He also testified about specific problems with the pool that he concluded were caused by APM's failure to perform its work in a good and workmanlike manner. The underwater light did not work because it was not connected to the junction box which, in turn, was not in operation. The grab rails leading out of the pool were improperly placed, requiring a person to improperly exit the pool. In addition, the grab rails were not properly grounded. The decorative tile was not level with the water line. The skimmers, responsible for circulating the

water both at the top and bottom of the pool, were not aligned with one another. As a result, water could not properly circulate. Hans also noted that the plaster in the pool was extremely rough. Finally, Hans testified that the bolts sticking out of the concrete to hold the diving board were unsafe.

The parties agree that the proper sequence of renovation was not followed in this case. According to Montwill, the proper sequence of events would have been to prepare the pool for plaster, install the decorative tile, pour the deck and install the coping, and plaster the pool. Hans similarly testified that the tile and coping should have been installed first. Once the coping was in place, the deck could be poured. Finally, the interior of the pool could be plastered. Here, it is undisputed that the deck was poured before the tile line was fixed. According to Montwill, the sequence was thrown off as a result of DiMiceli's decision to remove the old deck himself and call on Concrete Innovations to pour the deck.

After deliberating, the jury returned a verdict in favor of APM. The jury specifically found that DiMiceli breached the parties' agreement and that he was not excused for his breach. The jury also found that APM performed compensable work for DiMiceli. The jury refused to find that APM breached the parties' agreement. The jury awarded damages in the amount of $2,030.47 on APM's breach of contract claim and $6,380.47 on APM's claim for *quantum meruit*. The jury also awarded APM attorney's fees in the amount of $12,500 for trial and $4,000 for appeal. The trial court entered a judgment that provided that APM could elect the greater theory of recovery. DiMiceli filed a motion to modify the judgment and, in the alternative, a motion for new trial. That

motion was denied after a hearing. DiMiceli filed a timely notice of appeal.

### STANDARD OF REVIEW

DiMiceli raises no evidence issues as well as issues on claims in which he had the burden to prove at trial. We review these issues under the appropriate standards of review. When a party attacks the legal sufficiency of an adverse finding regarding an issue on which he has the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (per curiam) (Tex.2001) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex.1989)). In reviewing such a challenge, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The issue will be sustained only if the contrary proposition is conclusively established. *Id.*

On review of a no-evidence issue, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex.2002). If more than a scintilla of evidence exists to support the finding, the no evidence challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex.1998). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex.2002). In reviewing a factual insufficiency challenge, we must first con-

sider, weigh, and examine all the evidence supporting and contrary to the jury's determination. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

## Quantum Meruit

In his first issue, DiMiceli contends that APM cannot recover on its claims for *quantum meruit* as a matter of law because the parties had an express contract covering the services and materials in question. He also contends that there is no evidence to support the conclusion that APM partially performed under the contract such that it is able to recover under the theory of *quantum meruit*. Additionally, DiMiceli argues there is no evidence that APM provided any extra-contractual services or labor. We agree with DiMiceli.

■ As a general rule, "a plaintiff who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in *quantum meruit* only when there is no express contract covering those services or materials." *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988) (emphasis added). There is no dispute that a written contract exists. Thus, the existence of a contract bars APM's recovery on *quantum meruit* unless an applicable exception exists. A plaintiff may recover on the theory of *quantum meruit* where an express contract exists when a plaintiff has partially performed an express contract but, because of the defendant's breach, the plaintiff is prevented from completing the contract. *Id.* at 936. We must determine whether the evidence establishes as a matter of law that DiMiceli breached the agreement and that APM was prevented from completing the contract.

■ Montwill testified that APM completed the work in August. At that time, he and DiMiceli conducted a "walk through" of the pool. The "walk through" was conducted because the project was completed. According to Montwill, the two men discussed the pros and cons of the job. DiMiceli did not state any particular problems with the final result. Rather, he merely requested that plastic pieces left on the lawn be removed and that one tile in the pool be replaced. APM submitted an invoice to DiMiceli on August 20, 1999. The invoice reflects a previous balance of $2,900 and a payment of $1,500. Additional charges are listed for rails, escutcheons, anchors, eyeballs, main drain cover, step material, and associated labor costs to install the rails and steps. The charges for these services and materials amounted to $630.47. The invoice reflects a total balance due of $2,030.47. Montwill testified that this invoice reflected the amount owed by DiMiceli on the balance of the work under the service contract:

> [APM's Counsel]: All right. Let me hand you what I've had marked as Plaintiff's Exhibit 9, also. Can you identify that, please[?]
>
> [Montwill]: This is the balance, basically, of what was owed on the pool and what some of the extra things that we had done to the pool. On our original bid he didn't have the rails in there and stuff like that.
>
> \* \* \*
>
> [APM's Counsel]: All right. Let me hand you Exhibit 9, and also ask you to identify the handwriting in the middle of that document. Whose handwriting is that?
>
> [Montwill]: I believe it's the secretary that was working for us at the time.

[APM's Counsel]: Okay. What is that?

[Montwill]: This is just, basically, the balance of Dr. DiMiceli wanted us to do this work [sic], which was install all his pump equipment, put everything in. I told him before we would install this we needed to get payment or finish paying off the work on the pool. This basically here, it's kind of basically a receipt for him. We charged the remaining balance of 2030. Is also states here, "by passed heater at no charge. Hand cleaned pools twice." He was fixing to have a party, that's why we were doing that.

[APM's Counsel]: These three things that you have just named, those are extra services that you did for Dr. DiMiceli?

[Montwill]: Correct. I mean, we agreed to do them for him. He had some problems there, and he's like can you bypass the heater. And we were fixing to get all the repairs on the pump and motor and stuff, so I had no problem bypassing the heater and doing those things for him.

[APM's Counsel]: Exhibit 9 is an invoice dated August 20th?

[Montwill]: Correct.

[APM's Counsel]: Showing what was still due and owing?

[Montwill]: Correct

[APM's Counsel]: Now let's go back to the original contract that we have down here of the original contract price?

[Montwill]: Yes; [sic] that's correct.

[APM's Counsel]: Now, had you been paid any of that money by August 20th of the date of that invoice?

[Montwill]: Yes, I had.

[APM's Counsel]: How much?

[Montwill]: Showing here on August 20th, there was a balance of 2030 left.

This evidence, in light of the jury's finding that APM did not breach the agreement, establishes that APM completed the work required under the contract. Therefore, APM is precluded from arguing that it was prevented from completing the contract. APM cannot recover on the theory of *quantum meruit* on the basis of partial performance.

■ DiMiceli also argues that there is no evidence to establish that APM provided him with goods and services that were not covered by the service contract. The existence of an express contract does not preclude recovery in *quantum meruit* for the reasonable value of services rendered and accepted that are not covered by the contract. *Black Lake Pipe Line Co. v. Union Constr. Co.,* 538 S.W.2d 80, 86 (Tex.1976), *overruled on other grounds by Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). APM contends the August 20, 1999 invoice reflects extra-contractual goods and services provided to DiMiceli. As noted above, the invoice contains handwritten notes stating "bypassed heater," "set chems," and "clean pool 2x." Each of these notes is followed with the initials "N/C." Montwill specifically testified that these notes referenced the extra-contractual services APM provided. However, he also testified that APM provided these services at no charge to DiMiceli. Montwill did not specifically testify that the other services listed on the invoice were extra-contractual. On the contrary, Montwill treated the invoice as the balance owed under the contract. APM fails to point to other evidence in support of the proposition that it provided additional goods and services outside the contract. Accordingly, APM cannot recover on the theory of *quantum meruit* based upon extra-contractual services.

The evidence reflects that the goods and services provided by APM were covered by the service contract between APM and DiMiceli. Therefore, APM cannot recover

on its claim for *quantum meruit* as a matter of law. We sustain DiMiceli's first issue.

### BREACH OF CONTRACT AND BREACH OF IMPLIED WARRANTY

In his second issue, DiMiceli argues that he is entitled to a new trial because the jury's findings that APM did not breach the contract and did not breach the implied warranty of good workmanship are against the great weight and preponderance of the evidence. In his third issue, DiMiceli contends that the evidence is legally and factually insufficient to support the jury's finding that he breached the service contract. DiMiceli also contends the jury's refusal to find that any breach on his part was excused was against the great weight and preponderance of the evidence. In support of both issues, DiMiceli argues that his only obligation under the service contract was to make a final payment. This obligation, however, was contingent upon APM completing the job. Because DiMiceli claims APM failed to complete its duties under the contract, DiMiceli contends his obligation to make a final payment was not triggered; therefore, he did not breach the contract. Because DiMiceli's arguments regarding the jury's findings on breach of contract require us to assess the same evidence, we decide these issues together.

#### 1. Breach of Contract

DiMiceli contends that APM did not complete all the work it agreed to undertake under the service contract. In particular, DiMiceli claims APM breached the contract by failing to install decorative tile, failing to install a diving board, and failing to install a new underwater light. The service contract called for APM to install new tile, a new underwater light fixture, and a diving board and related equipment. The evidence reflects that APM installed decorative tile. The tile, however, appeared uneven in certain areas. The evidence also reflects that APM removed the old underwater light and "pulled through" a new light. The light did not work because it was not connected to the junction box.[1] Ignoring all evidence to the contrary, we conclude there is some evidence to establish that APM performed its obligations as required under the contract with respect to the decorative tile and underwater light.

There is also some evidence to show that APM fulfilled its contractual obligations as to the diving board. A written agreement may be modified by a subsequent oral agreement. *See Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 153 (Tex.Civ.App.-Texarkana 1988, writ denied). Prior to the deck being poured, Montwill informed DiMiceli that APM would not install the diving board because DiMiceli had hired Concrete Innovations to pour the deck. APM could not verify the strength of the concrete if another contractor was pouring the deck; therefore, Montwill informed DiMiceli that APM could not install the diving board because their insurance carrier would not allow it. Montwill also informed him that APM would not charge him for the installation of the board. There is evidence to suggest that DiMiceli was provided with a diving board and related equipment and not charged for installation. Because the evidence reflects that the parties modified the service contract so that APM needed to only provide a diving board and related

---

1. The evidence reflects that Concrete Innovations poured cement over the existing junction box. It subsequently located the box and ran a conduit. According to Montwill, however, this was improperly done and an electrician was needed to repair the conduit.

equipment,[2] we hold there is some evidence to support the jury's finding that APM did not breach the contract.

■■■■■ When one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform. *See Davis v. Allstate Ins. Co.*, 945 S.W.2d 844, 845–46 (Tex.App.-Houston [1st Dist.] 1997, no writ); *D.E.W., Inc. v. Depco Forms, Inc.*, 827 S.W.2d 379, 382 (Tex.App.-San Antonio 1992, no writ) (stating reciprocal promises in a contract are presumed to be mutually dependent and the breach of one will excuse performance of the other). Because we conclude that the evidence was sufficient to support the jury's finding that APM did not breach the contract, DiMiceli cannot argue that his breach was excused by APM's prior breach. APM fulfilled its obligations under the contract by installing new tile, a new underwater light, and by providing DiMiceli with a diving board. Therefore, DiMiceli's obligation to make a final payment was triggered. It is undisputed that DiMiceli never made a final payment. Accordingly, we hold that the evidence was legally and factually sufficient to support the jury's finding that DiMiceli breached the agreement.

*2. Breach of Implied Warranty of Good and Workmanlike Manner*

■■■■■ DiMiceli essentially complains of the quality of APM's work. As such, his contentions are better addressed in relation to his claim for breach of the implied warranty of good and workmanlike manner. The implied warranty of good and workmanlike manner provides that a service will be performed in a skillful and workmanlike manner. *Melody Home Mfg.*

*Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987). The implied warranty focuses on a constructor's conduct by defining the level of performance expected when the parties fail to make an express provision in their contract for such performance. *Centex Homes v. Buecher*, 95 S.W.3d 266, 273–74 (Tex.2002).

Upon his inspection, Hans determined that APM performed defective work. Hans specifically testified that the misalignment of the tile evidenced a lack of good and workmanlike performance. He also testified regarding the diving board, stating that the exposed bolts left in the concrete should have been removed. Finally, Hans testified that APM's scope of work on the installation of a new underwater light included connecting the light to a source of electricity such as the junction box. Tim Newman, a pool builder, testified that the pool was "shoddily-built." He also testified as to the cost of replacing or remedying all the alleged defects noted by Hans. The jury was instructed that performing services in a good and workmanlike manner meant "that quality of work performed by one who has knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally proficient by those capable of judging such work." DiMiceli contends that his claim for breach of the implied warranty is established because APM offered no evidence to suggest that its performance was compliant with the acceptable standards of work. We do not address whether such evidence was needed because we conclude that DiMiceli's claim for breach of the implied warranty by APM is not conclu-

---

**2.** In his reply brief, DiMiceli argues that APM is precluded by the parole evidence rule from arguing that it was not required to install a diving board. The record reflects that DiM- iceli did not object on this ground at the time Montwill testified. Accordingly, this evidence was considered by the jury.

sively established. *See Dow Chem. Co.*, 46 S.W.3d at 241.

One of the purposes behind the implied warranty that services be performed in a good and workmanlike manner is the protection of the helpless consumer who takes what he gets because he does not know enough technically to test or judge what is before him. *See Sears, Roebuck & Co. v. Nichols*, 819 S.W.2d 900, 904 (Tex.App.-Houston [14th Dist.] 1991, writ denied). Therefore, the implied warranty of good and workmanlike manner is not breached in those circumstances where a consumer is advised as to the need of certain repairs and the consequences of failing to make them. *See id.*

The evidence reflects that APM could not install the new tile ordered by DiMiceli because the beam was damaged. APM offered to repair the beam. DiMiceli refused, however, choosing to have Concrete Innovations take care of the problem when it poured the deck. Montwill informed DiMiceli that problems could arise from such a scenario and make APM's job more difficult. In particular, Montwill informed DiMiceli that the tile line would have an uneven appearance. Nevertheless, DiMiceli was adamant about Concrete Innovations doing the repairs. The evidence reflects that APM advised DiMiceli about the necessity of having APM perform repairs, explained the consequences to DiMiceli of APM not performing the repairs, and DiMiceli's insistence to not follow APM's advice. Under these circumstances there cannot be a breach of the implied warranty of good and workmanlike manner. *See id.* at 904–5.

Additionally, the jury considered the evidence that DiMiceli accepted or was satisfied with APM's work upon completion of the project. *See Wright Way Constr. Co., Inc. v. Harlingen Mall Co.*, 799 S.W.2d 415, 423 (Tex.App.-Corpus Christi 1990, writ denied) (holding evidence that showed work was accepted and paid for disputed evidence that mall had problems with work); *see also Mathis v. Bill De La Garza & Assocs., P.C.*, 778 S.W.2d 105, 108 (Tex.App.-Texarkana 1989, no writ) (holding jury finding that appellant accepted legal services negated her claim that appellee did not perform such services in a good and workmanlike manner). The jury was able to consider the evidence that upon APM's return to work after Concrete Innovations had poured the deck, Montwill informed DiMiceli that APM could not install the diving board because they could not verify the strength of the concrete. DiMiceli understood this and communicated that he would install the diving board. Montwill also testified that he informed DiMiceli that Concrete Innovations had poured cement over the junction box. DiMiceli admitted that Montwill pointed out to him that the junction box had been covered by Concrete Innovations. According to Montwill, DiMiceli responded by requesting APM to "pull [ ] the [new] light through for him." Finally, the jury was able to consider the evidence that on the day Montwill and DiMiceli conducted a "walk through," DiMiceli communicated that he was happy with the result and his only requests were that APM remove plastic pieces from the lawn and replace a chipped tile. In light of the entire record, we cannot say that the evidence conclusively establishes APM's breach of the implied warranty of good and workmanlike manner. *Cf. Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc.*, 889 S.W.2d 666, 673–74 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (holding evidence that appellee performed its assigned tasks as well as they could given evidence of interference was legally sufficient to establish appellee performed work in a good and

workmanlike manner). We overrule DiMiceli's second and third issues.

### ATTORNEY'S FEES

 In his final issue, DiMiceli contends that the evidence is factually insufficient to support the trial court's award of attorney's fees in the amount of $12,500 for trial and $4,000 for appeal. Chapter 38 of the Texas Civil Practice and Remedies Code allows for the recovery of attorney's fees for a valid *quantum meruit* claim or breach of contract claim. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). In awarding attorney's fees in this case, the jury was asked what amount would be a reasonable fee for the necessary services of APM's attorney for preparation of trial and appeal. The jury found $12,500 to be a reasonable amount for attorney's fees for trial and $4,000 for appeal. APM's trial counsel, Alex Katzman ("Katzman"), testified on the first day of trial that he had worked approximately 98.6 hours on the case and billed at a rate of $125 per hour. At this rate, APM incurred attorney's fees, "through the end of the day," of $12,325. Katzman also testified that in the event APM was successful, $3,500 would be the usual and customary fee for taking the case on appeal. DiMiceli's counsel, Robert Dahl ("Dahl"), also testified. Dahl testified that a reasonable award of attorney's fees on appeal would be $4,000. The trial court resumed the next day with closing arguments, the charge conference, and jury deliberations. The record reflects that Katzman participated in the charge conference and provided closing arguments.

Trial concluded the day after Katzman testified. Therefore, Katzman engaged in additional work beyond the time he testified, and the jury knew this when they deliberated. The evidence is sufficient to support the sum of $12,500 found by the jury to be a reasonable attorney's fee. *See Kollision King, Inc. v. Calderon*, 968 S.W.2d 20, 24 (Tex.App.-Corpus Christi 1998, no pet.) (holding that jury could consider time spent on case by attorney after he testified in support of attorney's fees). Additionally, the evidence is factually sufficient to support the jury's award of appellate attorney's fees. Katzman testified that in the event the case was appealed, the usual and customary fee would be $3,500. However, the jury could have also considered Dahl's testimony that $4,000 would be a reasonable appellate fee. We hold the evidence is sufficient to support the jury's award of trial and appellate attorney's fees. For these reasons, we overrule DiMiceli's fourth issue.

### CONCLUSION

We sustain DiMiceli's first issue. We reverse the trial court's judgment as to APM's claim of *quantum meruit* and render that APM take nothing on this claim. We modify the judgment such that APM recover on its claim for breach of contract. *See* TEX.R.APP. P. 43.2(c). We overrule DiMiceli's other issues and affirm the judgment as modified. *See* TEX.R.APP. P. 43.2(b).